¶ 1. On April 24, 2004, in the Chancery Court of the First Judicial District of Harrison County, Rhonda H. Yelverton was awarded a divorce from her husband, James B. Yelverton. The chancellor ordered the homes to be sold with the equity divided between Rhonda and James. The chancellor further ordered James to pay Rhonda lump sum alimony in the amount of $250,000 (at a minimum of $5,000 per month), periodic alimony in the amount of $2,500 per month, child support in the amount of $2,500 per month and twenty-five percent of his annual adjusted gross income over and above $150,000. Aggrieved *Page 50 
by the chancellor's ruling, James appeals raising the following five issues:
 I. WHETHER OR NOT THE CHANCELLOR ERRED IN AWARDING RHONDA $250,000 LUMP SUM ALIMONY.
 II. WHETHER OR NOT THE CHANCELLOR ERRED IN AWARDING RHONDA $2,500 IN MONTHLY CHILD SUPPORT.
 III. WHETHER OR NOT THE CHANCELLOR ERRED IN AWARDING RHONDA $2,500 MONTHLY PERIODIC ALIMONY.
 IV. WHETHER OR NOT THE CHANCELLOR ERRED IN AWARDING RHONDA AN ADDITIONAL TWENTY-FIVE PERCENT OF JAMES'S INCOME OVER $150,000.
 V. WHETHER OR NOT THE CHANCELLOR ERRED IN AWARDING RHONDA $10,000 IN ATTORNEY FEES.
 ¶ 2. Aggrieved by the Chancellor's ruling, Rhonda cross-appeals raising the following issue:
 I. WHETHER OR NOT THE CHANCELLOR ERRED WHEN ON THE MOTION TO RECONSIDER FILED BY JAMES, HE REQUIRED THAT THE PROCEEDS OF THE SALE OF THE MAGNOLIA PROPERTY BE APPLIED TO PAY A $25,000 DEED OF TRUST GRANTED POST-TRIAL TO JIM YELVERTON IMPORTS, INC, BY JAMES.
 ¶ 3. Finding no error on appeal and cross-appeal, we affirm.
 FACTS ¶ 4. James and Rhonda were married on September 7, 1988, and have three children. At the time of the filing of the divorce in February of 2002, Jason was nineteen, Blake was eleven and Elizabeth was ten. The Yelvertons lived in Hattiesburg, Mississippi and Lafayette, Louisiana, prior to moving to Gulfport, Mississippi in 1992. James was a car salesman, and Rhonda was a registered nurse. James took a job as the manager of Turan Foley Mitsubishi, which he and Rhonda later purchased in 1996 for $488,000. Turan Foley Mitsubishi then became Jim Yelverton Imports. In 2001, James sold fifty-two percent of the business to Ed Wettach for $654,825.93. The two executed a memorandum of agreement, that was introduced into evidence, and explained that James retained forty-eight percent of the business and his silent partner, Wettach, held the remaining fifty-two percent. This sale became complete in January of 2001.
 ¶ 5. Since the time Elizabeth was born in January of 1992, Rhonda did not work. She began working as a nurse part-time in April of 2002. In December 2002, James and Rhonda purchased a residence referred to as the Magnolia property as an investment. James and Rhonda separated on January 25, 2002, and Rhonda filed for divorce on February 18, 2002, on the ground of habitual cruel and inhuman treatment. After the separation, James resided at the Magnolia property, and Rhonda resided in the marital home with the children. On March 13, 2003, the chancellor entered a temporary order awarding the parties joint legal custody of the children with Rhonda having sole physical custody and James having visitation. The chancellor further ordered James to pay child support in the amount of $4,000 per month and temporary alimony. Rhonda was awarded use of the marital home and was responsible for the house note. At that time, the chancellor appointed James Koerber to assess the worth of Jim Yelverton Imports.
 ¶ 6. After the entry of this temporary order, James filed a motion for modification *Page 51 
listing debts which he had not previously mentioned. However, James violated the temporary order, because he failed to pay both the court ordered child support and alimony. Rhonda filed complaints for contempt against James for his failure to pay both child support and alimony. A hearing was held on the contempt matters on October 15, 2003. At that hearing, evidence was shown that James had only paid Rhonda $11,286.90, when he had owed her over $50,000 in child support and alimony. The chancellor reserved the contempt issue for trial.
 ¶ 7. The trial took place on November 17, 2003, and January 20, 21, 23 and 26, 2004, in the Chancery Court of the First Judicial District of Harrison County. Both James and Rhonda Yelverton testified along with other witnesses, including James Koerber, who was appointed by the court to evaluate the worth of Jim Yelverton Imports, and Ed Wettach, James's silent partner. Koerber reviewed the business documents of Jim Yelverton Imports and rendered his opinion that James' forty percent interest was worth $490,974 after appropriate discounts. James along with the company accountant, Ed Joe, argued that James and Wettach orally agreed that should the stock of the corporation be sold, Wettach would receive $612,288 (his investment in the company) first and then the two would split the remaining proceeds. Koerber dismissed this agreement since there was no documentation created when this transaction occurred in January of 2001, and it was not until August 2003, after the divorce complaint was filed, that this agreement was put into writing. The parties then agreed that the determination of the value of James's forty eight percent of the company should be left to the court.
 ¶ 8. The parties' joint tax returns were admitted into evidence to prove the couple's income. In 2001 the parties total income was $436,742 and in 2002 their income was $873,408 even though Rhonda only began working again part-time in August of 2002. After reviewing these tax returns and hearing testimony regarding the loan issue stated above from Wettach to Jim Yelverton Imports, the chancellor found the value of James's forty-eight percent to be $490,974.
 ¶ 9. The chancellor rendered his findings of fact and conclusion of law on April 13, 2004, and entered his judgment on April 29, 2004. The court granted Rhonda a divorce on the grounds of habitual cruel and inhuman treatment, awarded Rhonda primary custody and control of the minor children, and awarded James visitation after he and the children successfully completed counseling. The court also ordered James to pay child support in the amount of $2,500 per month and to provide medical and dental insurance for the minor children and for the parties to divide non-covered expenses. James was also ordered to pay college expenses for all three children. The court ordered the marital home and the Magnolia property to be sold and the proceeds divided after paying off the mortgage and loans.
 ¶ 10. The court awarded James ownership of Jim Yelverton Imports, but he was ordered to pay Rhonda $250,000 in lump sum alimony to be paid in minimum installments of $5,000 per month. The parties were ordered to each be responsible for their own personal debt, and Rhonda was awarded $2,500 per month in periodic alimony along with twenty-five percent of James' income over and above the annual adjusted amount of $150,000. Rhonda was also awarded the automobile that she was driving.
 ¶ 11. The court found James in contempt for his failure to pay ordered child support and spousal support and awarded Rhonda a judgment in the amount of *Page 52 
$40,771.83, which was to be paid within sixty days. Lastly, James was ordered to pay Rhonda's attorney's fees in the amount of $10,000 and court costs.
 ¶ 12. James filed a motion to reconsider on May 10, 2004. Rhonda filed another contempt action on June 3, 2004. On July 1, 2004, the court heard both the motion to reconsider and the contempt action. The chancellor amended his judgment to require $25,000, which was represented by a deed of trust between James and Jim Yelverton Imports to be paid to Jim Yelverton Imports out of the sale of the Magnolia property before the parties split the equity. Regarding the contempt action, James had only paid Rhonda $4,526.22 between April 1, 2004, and June 30, 2004. The court had ordered James to pay $40,771.83 in arrearage, monthly amounts of $2,500 in child support, $2,500 in periodic alimony and $5,000 in lump sum alimony. He was to pay this within sixty days of the judgment. Evidence also showed that James received funds in the amount of $158,202.13 during this time period.
 ¶ 13. At this hearing, James testified that he had numerous credit card debts, a new wife and baby to care for. However, evidence was presented that showed while Rhonda and the two minor children had sold the marital home and moved into an apartment as ordered by the court, James had gotten remarried, purchased a Mercedes for his new wife and they were living at the Magnolia property previously ordered to be sold by the chancellor. Therefore, the court found James in wilful contumacious contempt.
 LEGAL ANALYSIS ¶ 14. The standard of review for domestic relations cases is extremely clear. Saucier v. Saucier, 830 So.2d 1261,1263 (¶ 4) (Miss.Ct.App. 2002). Chancellors are given a broad discretion and this Court will not disturb a chancellor's ruling unless the finding was manifestly wrong, the chancellor abused his discretion, or he applied an erroneous legal standard.Andrews v. Williams, 723 So.2d 1175, 1177 (¶ 7) (Miss.Ct.App. 1998).
 I. WHETHER OR NOT THE CHANCELLOR ERRED IN AWARDING RHONDA $250,000 LUMP-SUM ALIMONY.
 ¶ 15. James argues that the chancellor erred when he awarded Rhonda lump sum alimony in the amount of $250,000. Lump sum alimony is paid as an equalizer because property distribution has left the spouse's assets not balanced.Miller v. Miller, 874 So.2d 469, 472 (¶ 10) (Miss.Ct.App. 2004). That is the issue in the present case. Instead of requiring Jim Yelverton Imports to be sold, and dividing the equity between Rhonda and James, the court allowed James to retain ownership but required him to pay Rhonda $250,000 in order to balance the property distribution.
 ¶ 16. There are four factors to consider when awarding lump sum alimony: (1) substantial contribution to accumulation of total wealth by either assisting in the spouse's business or quitting a job to stay home with the children; (2) the length of the marriage; (3) where recipient spouse has no other income or other estate is meager by comparison; (4) without the lump sum, the receiver would have no financial security.Cheatham v. Cheatham, 537 So.2d 435, 438 (Miss. 1988). However the single most important factor is the disparity of the separate estates. Id. All these factors have been met. Rhonda worked as a nurse until 1992, but after Elizabeth's birth in 1992, she stayed home with the minor children. Rhonda resumed working part-time in April of 2002. Rhonda and James were married for over fourteen years, and other than *Page 53 
Rhonda's parttime job as a nurse she had no other source of income. Rhonda did have a small savings account when the couple separated; however, that account had been depleted due to James's failure to pay the court ordered support.
 ¶ 17. Jim Koerber was appointed by the court to determine the value of James' forty-eight percent ownership in Jim Yelverton Imports. Koerber testified that James' interest equaled $490,974 after the appropriate discounts were subtracted. James argues that he offered to sell both residences along with stock in the company so that all could be divided. However, after the chancellor ordered him to sell the Magnolia property, he still refused to sell. James instead moved his new wife, Tracy Gambrell, along with their new baby into the Magnolia property and refused to leave. James testified that he and his new wife would be homeless if they sold the Magnolia property because they had too much debt to purchase a new home. This argument is hard to accept since both James and Tracy testified at the motion hearing for reconsideration that James had just purchased Tracy a brand new Mercedes SUV. This occurred while Rhonda followed the order of the court and sold the marital residence and divided the equity between the two parties. As a result of this sale and James's refusal to pay the lump sum alimony, the periodic alimony and the child support, which were all ordered by the court, Rhonda and the two minor children were forced to move into a small apartment. Therefore, it was not manifestly wrong for the chancellor to order James to pay Rhonda lump sum alimony in the amount of $250,000.
 II. WHETHER OR NOT THE CHANCELLOR ERRED IN AWARDING RHONDA $2,500 IN MONTHLY CHILD SUPPORT.
 ¶ 18. James argues that the court did not follow the guidelines when determining the amount of child support he should pay. According to Mississippi Code Annotated section 43-19-101 (Rev. 2004), for two children support should be in the amount of twenty percent of the adjusted gross income. James' guaranteed monthly wage is $10,000; however, after hearing all the testimony regarding bonuses and such the chancellor ruled that James makes at least $12,000 per month. Mississippi Code Annotated section 43-19-101(3)(a) (Rev. 2004) sets forth sources that may add to income including commissions and dividends. Furthermore since James makes more than $50,000 the chancellor does not have to follow these guidelines. Miss. Code Ann. § 43-19-101(4) (Rev. 2004). According to the chancellor's ruling on April 29, 2004, as a result of James' income and the children's expenses these guidelines would not apply.
 ¶ 19. On April 13, 2004, the chancellor explained in detail why he deviated from the statutory guidelines in accordance with Mississippi Code Annotated § 43-19-101(4) in his findings of fact and conclusions of law. The chancellor relied on evidence that in 2001, James' adjusted gross income was $275,288.79 or $22,940.73 per month, and in 2002, his adjusted gross income was $510,441.80 or $42,436.81 per month. Therefore, the chancellor concluded that James was capable of earning at least $12,000 per month after taxes.
 ¶ 20. James argues that he will remain in contempt because he is unable to pay this amount in child support. However, the evidence shows that James is not unable, but unwilling to pay this amount. James states that he makes $10,000 per month, and after he pays $2,500 in child support, then $2,500 in periodic alimony, he only has $5,000 remaining. This amount may be less than what James is *Page 54 
used to making and he may have to cut out some unnecessary spending but, this order is not unreasonable and can be followed. Furthermore, Tracy, James' new wife, testified that she has a job and will help support James.
 III. WHETHER OR NOT THE CHANCELLOR ERRED IN AWARDING RHONDA $2,500 MONTHLY PERIODIC ALIMONY.
 IV. WHETHER OR NOT THE CHANCELLOR ERRED IN AWARDING RHONDA AN ADDITIONAL TWENTY-FIVE PERCENT OF JAMES'S INCOME OVER $150,000.
 ¶ 21. Since both issues three and four deal with a form of alimony, we find it appropriate to discuss these two issues together. The chancellor set forth the twelve factors which are considered when deciding whether or not alimony is appropriate.Armstrong v. Armstrong, 618 So.2d 1278, 1280
(Miss. 1993). Those factors include: (1) the income and expense of the parties; (2) the health and earning capacity of the parties; (3) the needs of each party; (4) the obligations and assets of each party; (5) the length of the marriage; (6) presence or absence of the minor children in the home which may require that one or both of the parties either pay or personally provide child care; (7) the age of the parties; (8) the standard of living of the parties; (9) tax consequences; (10) fault or misconduct; (11) wasteful dissipation of assets by either party; and (12) any other factor deemed by the court to be "just and equitable" in connection with setting spousal support. Hammonds v. Hammonds, 597 So.2d 653, 655
(Miss. 1992). James argues that the court erred in applying the twelve factors considered when determining periodic alimony. However, we disagree. The chancellor gave a detailed assessment of all the factors in accordance with the evidence presented during the trial.
 ¶ 22. The chancellor also points out that although James claims to owe $612,288 as a repayment on the loan from Wettach, the stockholders' agreement issued at the time of the loan mentions nothing about this repayment. The chancellor ruled that this loan documentation was established after divorce proceedings commenced in an attempt to hide assets. Evidence was also presented that established that James' income fluctuated from year to year. James also testified that his income was going to decrease. Therefore, instead of raising the periodic alimony in accordance with James' past earnings, the chancellor ordered that twenty-five percent of James's earnings over $150,000 be awarded to Rhonda. The chancellor's factual ruling on this matter was not manifestly wrong or clearly erroneous.
 V. WHETHER OR NOT THE CHANCELLOR ERRED IN AWARDING RHONDA $10,000 IN ATTORNEY FEES.
 ¶ 23. James argues that the chancellor is ordering him to pay Rhonda's attorneys' fees because he purchased two plasma televisions. He goes further to state that the televisions were not plasmas. However, James does not take into consideration that he has yet to follow an order issued by the court. He never followed the temporary order resulting in him owing Rhonda over $40,000. Evidence has shown that as of January 19, 2004, Rhonda had attorney fees to pay in excess of $16,000. A portion of these fees were incurred as a result of contempt proceedings because James refused to follow the temporary order, and James took actions to prevent Rhonda from discovering his *Page 55 
net worth. Since James was held in contempt for violating the temporary order of the court, attorneys' fees should be awarded to Rhonda for seeking enforcement of that order. Elliott v.Rogers, 775 So.2d 1285, 1290 (¶ 25) (Miss.Ct.App. 2000). Therefore, the chancellor did not err in ordering James to pay Rhonda $10,000 for attorney fees.
 I. WHETHER OR NOT THE CHANCELLOR ERRED WHEN ON THE MOTION TO RECONSIDER FILED BY JAMES, HE REQUIRED THAT THE PROCEEDS OF THE SALE OF THE MAGNOLIA PROPERTY BE APPLIED TO PAY A $25,000 DEED OF TRUST GRANTED POST-TRIAL TO JIM YELVERTON IMPORTS, INC., BY JAMES.
 ¶ 24. The chancellor ruled, during the motion hearing for reconsideration, that $25,000 was to be paid back to Jim Yelverton Imports prior to dividing the equity remaining from the Magnolia property. The parties purchased the Magnolia property, in December of 2002, as an investment. However, shortly thereafter James moved in, he borrowed $25,000 for a down payment from Jim Yelverton Imports and financed the remainder of the purchase price through the bank. The chancellor ruled on July 26, 2004, that this $25,000 should be paid from the proceeds of the sale before the equity is split. However, James refused to sell this property and since it has been foreclosed upon the issue is moot.
 ¶ 25. We would point out that James brings this appeal before this Court while he is in wilful contempt of the chancery court order. James was given opportunity to pay some portion of what he was ordered by the court when he received his half of the equity from the sale of the marital home. However, instead of paying part of the arrearage he owed Rhonda, he paid his credit card bills. We therefore affirm the chancery court's ruling.
 ¶ 26. THE JUDGMENT OF THE CHANCERY COURT OF HARRISONCOUNTY IS AFFIRMED ON DIRECT APPEAL AND CROSS-APPEAL. ALL COSTSOF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE, P.J., SOUTHWICK, CHANDLER, BARNES, ISHEE, AND ROBERTS, JJ., CONCUR. GRIFFIS, J., CONCURS IN RESULT ONLY. IRVING, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.